**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
                                    :
ANGLERS CONSERVATION                :
NETWORK, et al.,                    :
                                    :
          Plaintiffs,               :
                                    :
     v.                             :    Civil Action No. 14-509 (GK)
                                    :
PENNY PRITZKER, et al.,             :
                                    :
          Defendants.               :
                                    :
```

**MEMORANDUM OPINION**

Plaintiffs Anglers Conservation Network, Paul Eidman, Gateway Striper Club, Inc., and Philip Lofgren (collectively, "Plaintiffs"), bring this case against Secretary of the Department of Commerce Penny Pritzker ("the Secretary"), the National Oceanic and Atmospheric Administration ("NOAA"), and the National Marine Fisheries Service ("NMFS") (collectively, "Defendants" or "the Government") pursuant to the Magnuson-Stevens Fishery Conservation and Management Act ("MSA" or "the Act"), 16 U.S.C. §§ 1801 et seq.; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq.; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq.

Plaintiffs challenge various elements of a Rule that Defendants promulgated amending the fishery management plan governing the Mackerel, Squid, and Butterfish ("MSB") fishery off of the eastern coast of the United States. Specifically, Plaintiffs

contend that Defendants unlawfully failed: (1) to include four species of river herring and shad as "stocks" to be regulated by the MSB fishery management plan; (2) to adopt observation measures necessary to prevent overfishing of the relevant river herring and shad species; and (3) to adequately consider the environmental impact of its chosen course.

This matter is before the Court on Plaintiffs' and Defendants' Cross-Motions for Summary Judgment [Dkt. Nos. 30, 31]. Upon consideration of the Motions, Oppositions [Dkt. Nos. 32, 36], Replies [Dkt. Nos. 36, 38], and the entire record herein, and for the reasons set forth below, the Motions for Summary Judgment filed by the Parties shall be **granted in part and denied in part.**

## I.    BACKGROUND

### A.    Statutory Background

#### 1.    Magnuson-Stevens Act

Congress first enacted the MSA in 1976 "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States[.]" 16 U.S.C. § 1801(b)(1). The Act establishes a federal-regional framework "for the conservation and management of the fishery resources of the United States" in order to "prevent overfishing," "rebuild overfished stocks," "[e]nsure conservation," and "facilitate long-term protection of essential fish habitats." Id. § 1801(a)(6); see also Natural Res. Def. Council, Inc. v. Daley, 209 F.3d 747, 749 (D.C. Cir. 2000).

Regulation of fisheries is accomplished through fishery management plans ("FMPs") that are developed and prepared by independent regional fishery management councils ("councils") and approved, implemented and enforced by NMFS,[1] a division within the Department of Commerce. See 16 U.S.C. §§ 1853-1854.

The MSA divides the United States into eight regions, each of which is represented by an independent fishery management council. See id. § 1852(a)(1). Councils are composed primarily of members who represent the interests of the states included in their region and who are appointed by the Secretary from a list of individuals submitted by the governor of each constituent state. Id. § 1852(b)(1), (2); see also C & W Fish Co. v. Fox, Jr., 931 F.2d 1556, 1557-58 (D.C. Cir. 1991). The remaining voting members of each council consist of the principal marine fishery management officials from each constituent state and the regional director of NMFS for the related geographic area. 16 U.S.C. § 1852(b)(1)(A), (B).

Each council is required to prepare and submit to the Secretary (acting through NMFS) a fishery management plan and any necessary amendments to such plan, "for each fishery under its authority that requires conservation and management[.]" Id.

---

[1] The Secretary has delegated her authority to approve or disapprove plans and their amendments under 16 U.S.C. § 1854(a)(3) to NMFS. Oceana, Inc. v. Locke, 831 F. Supp. 2d 95, 101 (D.D.C. 2011).

§ 1852(h)(1). The term "fishery" is defined in the Act as "one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics; and [] any fishing for such stocks." Id. § 1802(13). The term "stock of fish," in turn, is defined as "a species, subspecies, geographical grouping, or other category of fish capable of management as a unit." 16 U.S.C. § 1802(42).

A fishery management plan must describe the species of fish involved in the fishery and specify the "conservation and management measures" that are "necessary and appropriate" to "prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery[.]" Id. § 1853(a)(1)(A), (2).

After a council prepares and approves a fishery management plan or amendment, it is sent to NMFS, which reviews it for consistency with the MSA and other applicable laws and publishes it in the Federal Register for notice and comment. Id. § 1854(a)(1). After a 60-day notice and comment period, NMFS must "approve, disapprove, or partially approve a plan or amendment[,]" taking into account the views and comments of interested persons. Id. § 1854(a)(2),(3).

If NMFS approves a plan or amendment, or does not expressly disapprove it within 30 days, it becomes effective. Id.

§ 1854(a)(3). If NMFS disapproves or partially approves the plan or amendment, NMFS must thereafter notify the council of "the applicable law with which the plan or amendment is inconsistent"; the "nature of such inconsistencies"; and specific "actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law." Id. § 1854(a)(3). The council "may" thereafter "submit a revised plan or amendment to the Secretary for review [.]" Id. § 1854(a)(4).

2.    National Environmental Policy Act

Congress enacted NEPA in order "to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may . . . fulfill the responsibilities of each generation as trustee of the environment for succeeding generations." 42 U.S.C. § 4331(b). To accomplish that goal, NEPA requires all federal agencies to prepare an Environmental Impact Statement ("EIS") whenever they propose "major Federal actions significantly affecting the quality of the human environment." Id. § 4332(2)(C). The EIS must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

### B.    Factual Background[2]

#### 1.    *Shad and River Herring*

At the center of this case are four species of anadromous fish, that is, fish that spend most of their lives in ocean waters but migrate upstream to fresh water in the spring to spawn. See AR 11408. Anadromous fish play a critical role in the biology of rivers, estuaries and ocean waters along the Atlantic seaboard as prey for many species of fish, birds, and marine mammals. AR 8265, 8268, 8291, 8416, 12818, 12947, 13498.

Two of the four species at issue in this case are known as river herring.  They are: Alewife (alosa pseudoharengus), which are most abundant in the Mid-Atlantic and Northeastern states, and blueback herring (alosa aestivalis), which are found from Nova Scotia to northern Florida and are most abundant in waters south of the Chesapeake Bay. AR 1148. Alewife spawn in rivers, creeks, lakes, and ponds over rocks, detritus, submerged aquatic vegetation, and sand. Id. Blueback herring generally prefer to

---

[2] Plaintiffs' briefs contained citations to factual materials beyond the scope of the Administrative Record. The Government objected to the Court's consideration of those materials and accordingly, filed a Motion to Strike Extra-Record Documents and Citations [Dkt. No. 33]. The Court granted that Motion [Dkt. No. 44].

For these reasons, the facts that follow are drawn solely from the Administrative Record ("AR") [Dkt. No. 43] compiled by NMFS.

spawn over sand or gravel in swift-flowing areas of rivers and tributaries. Id.

The other two species are known as shad. They are:  American Shad (alosa sapidissima), which historically populated all major North American rivers from Maine to the east coast of Florida. AR 11201, 11411. American shad stocks are river-specific, which is to say that each major tributary along the Atlantic coast provides the spawning area for a particular stock of American shad. Id. The other species  is Hickory Shad (alosa mediocris) of which less is known.  "[D]istribution and movements of hickory shad are essentially unknown after they return to the ocean"; however, "due to harvest along the southern New England coast in the summer and fall it is assumed that they also follow a migratory pattern similar to the American shad[.]" AR 11411.

The Administrative Record is not entirely clear as to the current status of the shad and river herring. Portions indicate that the four species are relatively numerous, whereas others show diminishing numbers. Compare 78 Fed. Reg. 48,944, 48,992 with AR 10438.

For example, in May 2012 the Atlantic States Marine Fisheries Commission ("ASMFC") performed an assessment of 52 stocks of alewife and blueback herring. AR 12921. However, the ASMFC lacked sufficient data to develop estimates of abundance and fishing mortality for 28 of the 52 stocks. Id. Of the 24 stocks for which

data were available, 23 were depleted relative to historic levels and one stock was increasing. Id.

By contrast, in 2013, relying on the blueback herring's coast-wide population growth rate, NMFS concluded that the relative abundance of blueback herring throughout its range is stable. 78 Fed. Reg. 48,944, 48,992. Moreover, there are at least three contiguous populations of alewife that are either stable or significantly increasing. Id. From a coast-wide perspective, the trajectory of the alewife population is significantly increasing and all of the stock complexes are stable or significantly increasing. Id.

On August 12, 2013, NMFS issued a 50-page decision finding that listing river herring (i.e., both alewife and blueback herring) as threatened or endangered under the Endangered Species Act ("ESA") was not warranted. See 78 Fed. Reg. 48,944. NMFS determined that neither species of river herring was in danger of extinction or likely to become so for the foreseeable future to 2030. Supp. AR, 78 Fed. Reg. at 48,993.

The pattern of mixed and limited data continues with both species of shad. In 2012, the Mid-Atlantic Fisheries Management Council ("the Council") set out to study 32 stocks of American and hickory shad. AR 12924. The Council found that it lacked sufficient information to make any conclusions about eight of the 32 stocks. Id. However, it was able to conclude that 11 stocks were depleted

relative to historic levels, 2 were increasing, and 11 were stable. Id. The lack of adequate data has prevented any reliable assessments of the stock abundance and fishing mortality of shad. AR 8567, 8805, 9227.

> 2. *Mackerel, Squid and Butterfish Fishery Management Plan*

The Mid-Atlantic Fisheries Management Council established the Atlantic Mackerel, Squid and Butterfish Fishery Management Plan in 1983. The Council manages these three species as a single unit because of their similarities in fishing seasons and vulnerability to common threats, including the threat of by-catch from foreign fleets. River herring (alewife and blueback herring) and shad (American shad and hickory shad) are anadromous species that co-occur seasonally with mackerel; fishermen harvest them as incidental catch in the mackerel fishery. 79 Fed. Reg. 10,031 (Feb. 24, 2014). When river herring and shad are encountered in the mackerel fishery, they are either discarded at sea ("bycatch") or retained and sold as part of the mackerel catch ("incidental catch"). Id.; see also AR 11404.

> a.  Amendment 14

In June 2010, the Mid-Atlantic Fisheries Management Council published a notice of intent to prepare a new amendment to the MSB fishery management plan ("MSB FMP"), known as Amendment 14. 75 Fed. Reg. 32,745; see also 79 Fed. Reg. 10,029 (Feb. 24, 2014). In

the initial stages of considering the alternative measures that might be included in Amendment 14, the Council set out to do the following: "1) improve monitoring and observing of incidental [river herring and shad] catch; 2) consider ways to reduce [river herring and shad] catch; and 3) consider adding [river herring and shad] as managed stocks in the MSB FMP (i.e. as stocks in the fishery) so as to improve overall [river herring and shad] conservation." AR 8191.

First, as part of Amendment 14, the Council and NMFS implemented new measures that are intended to minimize herring/shad bycatch mortality in the mackerel fishery, and improve the precision of the Council and NMFS's estimates of herring/shad catch and bycatch. After a public comment period, NMFS partially approved Amendment 14, on November 7, 2013. 79 Fed. Reg. at 10,029, 10,031. Amendment 14 established a mortality cap measure for the herring/shad in the mackerel fishery. The cap requires the mackerel fishery to close once NMFS has determined that the mackerel fishery has caused a certain amount of herring/shad mortality. Id. The Council and NMFS reasoned that capping the allowed level of river herring and shad catch in the mackerel fishery would provide a strong incentive for the industry to continue to avoid river herring and shad, and minimize encounters with and therefore reduce the bycatch of these species. Id.

Second, Amendment 14 also set forth several measures NMFS intends to initiate in the future to reduce herring/shad bycatch and bycatch mortality, including the development of a "bycatch avoidance strategy" with state and university partners. 79 Fed. Reg. 10,029, 10,034.

In addition, Amendment 14 requires 48-hour pre-trip notification of intent to retain more than 20,000 pounds of mackerel. Id. Such notification is required to ensure that the Council and NMFS have sufficient notice to assign observers to the fishing vessels. Id. The notification also requires daily catch reporting for certain mackerel vessels via the Vessel Monitoring System in order to facilitate monitoring and cross-checking with other data sources. Id.

The Amendment also requires six-hour pre-landing notification via the Vessel Monitoring System to land over 20,000 pounds of mackerel to allow sufficient notice to facilitate at-sea monitoring, enforcement, and portside monitoring. Id. The Amendment expands requirements related to at-sea observer sampling to help ensure safe sampling and improve data quality. The Amendment prohibits slippage (i.e., at sea dumping of fish that have been caught) on limited access mackerel trips with observers aboard, and requires vessel operators to submit a released catch affidavit for each slippage event. Id.

Notably, and at the heart of this case, the final version of Amendment 14 promulgated by NMFS did not include two measures that Plaintiffs support. First, the Council recommended a version of Amendment 14 that would have increased the number of on-board observers who monitor compliance with applicable law. AR 12799. As proposed by the Council, observers would have been on 100% of certain vessels in the MSB fishery and would have been partially funded by the fishing industry itself. Id. For a variety of reasons discussed below, NMFS rejected this measure in the final version of Amendment 14. 79 Fed. Reg. 10,034.

Second, the Council decided not to recommend the addition of herring/shad stocks to the MSB fishery in Amendment 14. 79 Fed. Reg. 10,034. Instead, the Council stated that it would further consider adding stocks to the fishery in the subsequent Amendment 15. Id.

b.    Amendment 15

On June 14, 2012, Defendants and the Council initiated Amendment 15 "to add [river herring and shad] as stocks in the fishery," AR 10444, and scoping for the action began in October 2012. 77 Fed. Reg. 65,867. Numerous fishermen and other stakeholders commented on the need to add river herring and shad to the MSB FMP. AR 13789. On October 8, 2013, after studying the issue and considering public comments and testimony, the Council suspended further consideration of Amendment 15, and instead

- 12 -

created a new working group to further study the issue for at least three years. 79 Fed. Reg. 10,034. Plaintiffs challenged the termination of Amendment 15, and this Court granted Defendants' Motion to Dismiss that challenge on September 30, 2014. Anglers Conservation Network v. Pritzker, 70 F. Supp. 3d 427, 441 (D.D.C. 2014).

    C.    *Procedural Background*

On February 24, 2014, NMFS promulgated the final version of Amendment 14. 79 Fed. Reg. 10029.

On March 26, 2014, while their challenge to the Council's suspension of Amendment 15 was still pending, Plaintiffs filed their Complaint challenging Amendment 14 [Dkt. No. 1].

On October 27, 2014, Plaintiffs filed their Motion for Summary Judgment [Dkt. No. 30]. On December 4, 2014, the Government filed its combined Cross-Motion for Summary Judgment and Opposition [Dkt. No. 31]. On December 19, 2014, Plaintiffs filed their combined Opposition and Reply [Dkt. No. 36), and on January 20, 2015, the Government filed its Reply [Dkt. No. 38].[3]

**II. STANDARD OF REVIEW**

Summary judgment will be granted when there is no genuine issue as to any material fact. See Fed. R. Civ. P. 56(c). Because

---

[3] On September 24, 2015, Defendants filed a Notice of Supplemental Authority [Dkt. No. 45].  No response was filed.  The Court is not relying upon this last-minute submission by Defendants.

- 13 -

this case involves a challenge to a final administrative decision, the Court's review on summary judgment is limited to the Administrative Record. Holy Land Found. for Relief and Dev. v. Ashcroft, 333 F.3d 156, 160 (D.C. Cir. 2003) (citing Camp v. Pitts, 411 U.S. 138, 142 (1973)); Richards v. INS, 554 F.2d 1173, 1177 (D.C. Cir. 1977) ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record.").

Agency decisions under the Magnuson-Stevens Act and NEPA are reviewed pursuant to Section 706(2) of the APA. 16 U.S.C. § 1855(f)(1)(B) ("the appropriate court shall only set aside" actions under the MSA "on a ground specified in [5 U.S.C. §] 706(2)(A), (B), (C), or (D)."); Oceana, Inc. v. Locke, 670 F.3d 1238, 1240-41 (D.C. Cir. 2011); C & W Fish, 931 F.2d at 1562; Oceana v. Locke, 831 F.Supp.2d 95, 106, 2011 WL 6357795, at *8 (D.D.C. 2011). In relevant part, 5 U.S.C. § 706(2) requires a court to hold agency action unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

The arbitrary and capricious standard of the APA is a narrow standard of review. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). It is well established in our Circuit that the "court's review is . . . highly deferential" and "we are 'not to substitute [our] judgment for that of the agency' but must 'consider whether the decision was based on a

- 14 -

consideration of the relevant factors and whether there has been a clear error of judgment.'" Bloch v. Powell, 348 F.3d 1060, 1070 (D.C. Cir. 2003) (quoting S. Co. Servs., Inc. v. FCC, 313 F.3d 574, 579-80 (D.C. Cir. 2002)); see also United States v. Paddack, 825 F.2d 504, 514 (D.C. Cir. 1987). However, this deferential standard cannot permit courts "merely to rubber stamp agency actions," NRDC v. Daley, 209 F.3d 747, 755 (D.C. Cir. 2000), nor be used to shield the agency's decision from undergoing a "thorough, probing, in-depth review." Midtec Paper Corp. v. United States, 857 F.2d 1487, 1499 (D.C. Cir. 1988) (internal citations and quotations omitted).

An agency satisfies the arbitrary and capricious standard if it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)); Lichoulas v. FERC, 606 F.3d 769, 775 (D.C. Cir. 2010). Finally, courts "do not defer to the agency's conclusory or unsupported suppositions." McDonnell Douglas Corp. v. U.S. Dep't of the Air Force, 375 F.3d 1182, 1186-87 (D.C. Cir. 2004).[4]

---

[4] The purpose of a motion for summary judgment challenging final agency action is "to test the agency action against the administrative record." LCvR 7(h). The Court must evaluate the agency's decision on the basis of "the full administrative record

## III. ANALYSIS

### A.   Count I: Failure to Include River Herring and Shad Stocks in the MSB Fishery

#### 1.   *The Government's Duty to Consider Adding Stocks to the Fishery*

Plaintiffs contend that the Government violated the APA and the MSA by refusing to add river herring and shad stocks to the MSB fishery because NMFS's own data and analysis demonstrate that the four species at issue are caught in the fishery and require conservation and management. The Government responds with a variety of arguments as to why it refused to even consider addition of river herring and shad stocks to the MSB fishery as part of Amendment 14. The Government also contends on the merits that its decision declining to add new stocks to the fishery was not arbitrary and capricious.

The Government's first response to Plaintiffs' contention is that the burden for assessing which stocks should be in a fishery rests with the regional councils, not NMFS. But this Court has previously rejected that argument. See Flaherty v. Bryson, 850 F.

---

that was before the Secretary at the time [she] made [her] decision." Citizens to Pres. Overton Park v. Volpe, 401 U.S. 402, 420 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977). In reviewing agency action, the district court "sits as an appellate tribunal, not as a court authorized to determine in a trial-type proceeding whether the Secretary's [action] was factually flawed." Marshall Cnty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1225 (D.C. Cir. 1993).

Supp. 2d 38, 54 (D.D.C. 2012) ("it is [NMFS's] responsibility to decide whether an FMP, including the composition of its fishery, satisfies the goals and language of the MSA." (internal citation omitted)).

Although amendments to fishery management plans originate with the regional fisheries management councils, 16 U.S.C. § 1852(h)(1), ultimate responsibility for the details of any amendment -- including the decision to add certain stocks to a fishery -- rests with NMFS. Flaherty, 850 F. Supp. 2d at 54. Regardless of what the Council recommends, "NMFS must make its own assessment of whether the Council's determination as to which stocks can be managed as a unit and require conservation and management[5] is reasonable." Id. at 55 (citing Motor Vehicle Mfrs. Ass'n, 463 U.S. at 52).

The Government does not dispute that river herring and shad could be managed as a unit along with the mackerel, squid, and

_____

[5] See 16 U.S.C § 1802 (5), which provides that "[t]he term 'conservation and management' refers to all of the rules, regulations, conditions, methods, and other measures (A) which are required to rebuild, restore, or maintain, and which are useful in rebuilding, restoring, or maintaining, any fishery resource and the marine environment; and (B) which are designed to assure that--(i) a supply of food and other products may be taken, and that recreational benefits may be obtained, on a continuing basis;(ii) irreversible or long-term adverse effects on fishery resources and the marine environment are avoided; and (iii) there will be a multiplicity of options available with respect to future uses of these resources."

butterfish. The ultimate question for the Court is whether the Government's decision refusing to add river herring and shad stocks to the MSB fishery was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

Second, the Government contends that it need not have considered whether to add new stocks to the fishery because the Council would be considering it as part of Amendment 15. However, it is well established that promises of future compliance with the law cannot satisfy the Government's current legal obligation. See Conservation Law Found. v. Evans, 209 F. Supp. 2d 1, 10 (D.D.C. 2001); see also Oceana, Inc. v. Pritzker, 24 F. Supp. 3d 49, 62 (D.D.C. 2014); Oceana v. Locke, 831 F. Supp. 2d 95, 121-22 (D.D.C. 2011). Thus, if the Court were to conclude that, based upon the Administrative Record compiled for Amendment 14, the MSA requires the addition of river herring and shad stocks to the MSB fishery, the Government cannot escape Plaintiffs' challenge with the mere promise to consider the issue as part of a future amendment.[6]

---

[6] The Government also notes that in a related case dealing exclusively with Amendment 15 this Court held that Plaintiffs could not challenge the Council's failure to proceed with that Amendment. The Government asserts that "[t]he Court should decline to permit Plaintiffs to circumvent the Court's previous decision by granting them the relief they could not obtain in the Amendment 15 case." Gov't's Reply at 14 (citing Anglers Conservation Network v. Pritzker, 70 F. Supp. 3d 427, 440 (D.D.C. 2014)). However, despite the Government's assertions, the opinion the Government cites sheds no light on whether Plaintiffs may obtain the relief they

Third, the Government also argues that it need not complete a wholesale review of which stocks should be in a particular fishery with each amendment to that fishery's management plan. Gov't's Mot. at 32 (citing Oceana, Inc. v. Pritzker, 24 F. Supp. 3d 49, 63 (D.D.C. 2014); Pacific Coast Federation of Fishermen's Associations v. Blank, 693 F.3d 1084, 1102, n.15 (9th Cir. 2012)). It is true, as Judge Contreras in this District Court recognized, that "[i]f the [Government] were required to make a wholesale reconsideration of which stocks to include in the fishery every time it amends an FMP, the delay [caused by the amendment review process] would be much greater." Oceana, Inc. v. Pritzker, 24 F. Supp. 3d 49, 64 (D.D.C. 2014).

Although not every single FMP amendment gives rise to a duty to consider a wholesale review of which stocks should be added to the fishery, consideration of certain amendments would logically include such a duty. It is black letter law that an agency acts arbitrarily and capriciously when it "entirely fail[s] to consider an important aspect of the problem." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. The Council initially took up Amendment 14 in order to consider whether "the management framework then in place [was]

---

seek in this action. Plaintiffs could not obtain relief in Anglers Conservation Network, 70 F. Supp. 3d at 440, because they failed to identify "a discrete agency action that [the Government was] required to take." In this action, by contrast, Plaintiffs challenge final agency action: Amendment 14.

insufficient to manage [river herring and shad]." Gov't's Mot. at 15 (citing AR 12724); see also 78 Fed. Reg. 53404 (Council adopted Amendment 14, among other reasons, "to address incidental catch of river herring and shad").

Plaintiffs respond that because the management of shad and river herring stocks was a central concern of Amendment 14, failing to give even a nod to the obvious possibility of adding these species to the MSB fishery was arbitrary and capricious. However, despite the Government's contention that it had no duty to consider adding stocks to the fishery, the Government did, in fact, consider adding the river herring and shad stocks to the MSB fishery. Moreover, the Government documented its views in its Draft Environmental Impact Statement ("DEIS"). AR at 8373. See, infra.

In its final argument, the Government next argues that the Court should not reach the merits of the stocks-in-the-fishery question because Plaintiffs have not petitioned NMFS to add river herring and shad to the fishery under 5 U.S.C. § 553(e). However, 5 U.S.C. § 704 provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." Amendment 14 falls within §704's reach. 16 U.S.C. § 1855(f). The Government cites no authority for the proposition that Plaintiffs were required to petition NMFS in order to challenge Amendment 14.

Accordingly, Plaintiffs' failure to submit such a petition is irrelevant.

### 2. The Government's Decision Rejecting Addition of Stocks to the Fishery

Plaintiffs contend that the Government's failure to add the stocks to the fishery was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

Citing 16 U.S.C. § 1852(h)(1) and Flaherty, 850 F. Supp. 2d at 54-55, Plaintiffs contend that all stocks that can be managed in a fishery and require conservation and management must be added to a fishery under an FMP. The Government disagrees, arguing that the MSA affords NMFS discretion as to whether stocks requiring conservation and management must be included in an FMP, and that stocks are required to be added to a fishery only when they are overfished or approaching an overfished condition. Gov't's Mot. at 32 n. 13 (citing 16 U.S.C. § 1854(e)); Gov't's Reply at 15.

This Court has already considered and ruled on these issues. In Flaherty, the Court rejected the Government's "overfishing" standard, stating clearly that while "[i]t is true that the MSA requires management measures when NMFS finds overfishing[,] it certainly does not follow that in the absence of overfishing NMFS may simply rubber stamp the Council's decisions." 850 F. Supp. 2d at 54.

- 21 -

The Court went on to hold that the MSA requires that any stocks requiring the conservation and management provided by an FMP must be placed under one. See Flaherty 850 F. Supp. 2d 38, 54-55 (D.D.C. 2012) (holding that NMFS must "ensur[e] compliance with Section 1852(h)'s requirement that the Council prepare an FMP or amendment for any stock of fish that requires conservation and management"). The Court reasoned that:

> Section [1852(h)] requires FMPs and necessary amendments for all stocks of fish which can be treated as a unit for purposes of conservation and management and which are in need of conservation and management. Thus, NMFS must make its own assessment of whether the Council's determination as to which stocks can be managed as a unit and require conservation and management is reasonable.
>
> There is no basis for concluding, as [the Government does], that the structure of the MSA weakens Section 1854's command that NMFS review proposed plans and amendments for compliance with the statute. The standards to be applied in reviewing NMFS's conclusion that [an amendment] complies with Section 1852(h) are therefore no different than review of NMFS's conclusion that an amendment complies with the National Standards.

Flaherty, 850 F. Supp. 2d at 54-55 (internal citations and quotation marks omitted).[7]

---

[7] The Government relies heavily upon a recently published opinion from the U.S. District Court for the District of Alaska to support its contention that the MSA is ambiguous as to "whether all stocks that have conservation and management needs must be added to a federal fishery management plan." See Gov't's Reply at 14-17 (citing United Cook Inlet Drift Assoc. v. National Marine Fisheries Service, No. 13-104 (D. Ak. Sept. 5, 2014)). This decision is not binding on this Court, and the Court declines to follow it.

As noted earlier, the Government does not dispute that river herring and shad stocks can be treated as a unit along with mackerel stocks for the purposes of conservation and management, which is to say that the Government has not disputed that river herring and shad could be added to the MSB fishery. See 16 U.S.C. § 1802(13) (defining "fishery" as "one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics; and [] any fishing for such stocks."). Accordingly, the only question is whether river herring and shad require the conservation and management measures that inclusion in the MSB FMP would provide.

The Government contends that the Administrative Record prepared for Amendment 14 "did not demonstrate that herring/shad required conservation and management under an MSA fishery management plan." Gov't's Mot. at 33 (emphasis in original). Plaintiffs disagree, arguing that "[t]he best available scientific information in the [A]dministrative [R]ecord demonstrates that river herring and shad need conservation and management, that catch in federal fisheries has contributed to their decline, and that their addition as stocks managed in the plan is necessary to conserve and manage them[.]" Pls.' Reply at 13.

As already noted, supra at p. 7, the current status of the
four species of river herring and shad is not entirely clear from
the data available.   Plaintiffs note that a variety of factors
have caused declines in the river herring and shad populations.
See AR 8389-92, 10436-39, 13498. Among other things, Plaintiffs
point to a report from May 2012, stating that "[o]f the 52 stocks
of alewife and blueback herring for which data were available, 23
were  depleted  relative  to  historic  levels,  one  stock  was
increasing, and the status of 28 stocks could not be determined
because the time-series of available data was too short." Atlantic
States  Marine  Fisheries  Commission  Stock  Assessment  Overview:
River  Herring,  AR  10438.  Furthermore,  "the  Protected  Special
Division of NMFS designated river herring as a 'species of concern'
in 2006." Pls.' Mot. at 11 (citing 71 Fed. Reg. 61,022). [8]

However, the Administrative Record also contains significant
positive information about the well-being of river herring and
shad stocks. Sources in the Record demonstrate that the coast-wide
population of blueback herring growth rate is stable. 78 Fed. Reg.
48,944, 48,992. With respect to alewife, at least three contiguous
populations are stable to significantly increasing. Id. The coast-
wide trajectory for alewife is significantly increasing, and all

---

[8] In other words, reliable data could not be obtained for more
than half of the 52 stocks.

of the stock complexes are stable or significantly increasing. Id.
When the Mid-Atlantic Fishery Management Council set out to study
32 stocks of hickory shad in 2012, it found that 11 stocks were
depleted relative to historic levels, two were increasing, and 11
were stable. AR 12924. The Council concluded it lacked sufficient
information to reach any conclusions about eight of the 32 stocks.
Id.

     In further support of its position that herring/shad do not
require conservation and management in the MSB fishery, the
Government points out that materials Plaintiffs cite to show that
river herring in the Mid-Atlantic are overfished relate to state,
not federally, managed waters. See AR 7838, 7975-76. The Government
also notes NMFS findings that dams and barriers, rather than
fishing in federally-managed fisheries, are "the most important
threat" to river herring, 78 Fed. Reg. 48,970, and contends that
bycatch in federally managed fisheries has not been shown to have
a strong connection to the amount of shad stocks, AR 8335. The
Government also points to state and federal actions to address
these problems, including a herring bycatch avoidance program and
state fishery management plans and fishing moratoria, that make
conservation and management measures in an FMP unnecessary.
Gov't's Mot. at 16-18 (citing 79 FR 10,029 at 10,034); id. at 23
(58 Fed. Reg. 44,190).

As the Draft Environmental Impact Statement summarizes, "the uncertainty regarding the current factors causing [river herring and shad] populations to remain in a depressed state means that it is difficult to identify specific causes and link remedies to specific outcomes. Given this, the extent of benefits from adding [river herring and shad] as stocks in the fishery is very difficult to quantify even though impacts are likely to be positive." AR 8267.

Plaintiffs' burden is to show that NMFS acted arbitrarily or capriciously in determining that river herring and shad are not in need of conservation and management measures provided by an FMP. In light of the evidence just cited, as well as the uncertainty and lack of reliable data as to why and how the river herring and shad populations have declined, it cannot be said that Defendants have been arbitrary and capricious in making their decision.

In the face of such uncertainty, the Government is not obligated to add stocks to the fishery simply because the "impacts [of doing so] are likely to be positive." Id. An agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. NMFS has done so, and therefore, the Government must prevail on Count I.

**B.    Count II: Monitoring and Accountability Measures to Prevent Overfishing**

Plaintiffs' second objection to Amendment 14 is that it fails to include sufficient monitoring and accountability measures to prevent overfishing of river herring and shad stocks in the MSB fishery. They contend that by failing to approve specific observer coverage levels recommended by the Council, NMFS has violated MSA provisions codified at 16 U.S.C. §§ 1851(a) and §§ 1853(a) and acted arbitrarily and capriciously.

*1.    The Government's Rejection of 100% Observer Coverage*

As part of Amendment 14, the Council recommended that NMFS mandate the placement of an observer on every small mesh bottom trawl mackerel trip in the MBS fishery (referred to by the Parties as "100% observer coverage"). Plaintiffs assert that the Government should have approved the 100% observer coverage plan, which would have been funded through "cost sharing" (i.e., dividing the costs of coverage between NMFS and fishing industry participants). The Government responds that the Council's proposal would have violated federal statutes outside of the MSA framework, in contravention of 16 U.S.C. § 1853(a)(1)(C)'s requirement that provisions of fishery management plans "shall [be] consistent with . . . any other applicable law[.]"

NMFS objected to the 100% observer coverage recommendation because it would have obligated the agency to make future outlays

for observer coverage beyond what Congress has allocated and to augment its budget by accepting fees from the fishing industry. This, the Government contends, would violate the following statutes: the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1), which prohibits federal officers from making expenditures or authorizing obligations that exceed Congressional appropriations; the Miscellaneous Receipts Statute, 31 U.S.C. § 3302(b), which requires government officials to deposit money received on behalf of the United States in the Treasury not the particular agency; and 18 U.S.C. § 209, which prohibits the payment of federal employees' salaries from non-governmental sources.

The Administrative Record amply documents NMFS's concerns about the cost-sharing proposal, e.g., AR Emails 14142, 13187, 13598, 13375, and Plaintiffs do not directly contest the Government's arguments based on the statutes named above.[9]

Instead, Plaintiffs contend that the Government's concerns about unfunded mandates are inapposite because the Council intended that the fishing industry would pay the entire cost of 100% observer coverage. However, the Administrative Record shows

_____

[9] Plaintiffs do note that the Government has engaged in "cost sharing" programs with industry participants in other fisheries in order to provide higher observer coverage levels. However, the Government points out that those programs were expressly authorized by statute for particular fisheries only. See 16 U.S.C. § 1862 (authorizing, under MSA § 313, a system of fees for observers in North Pacific fisheries).

that the Council intended that industry participants would pay $325 per day toward the cost of an observer, whereas the actual cost for an observer can be more than double that amount. AR 11255, 11575, 13735, 14144.

For these reasons, the Court concludes that NMFS's disapproval of the Council's 100% observer coverage proposal was not arbitrary, capricious, or contrary to law.[10]

### 2. Standardized Bycatch Reporting Methodology

Observers placed onboard fishing vessels to monitor their compliance with applicable laws and regulations are generally allocated in accordance with the Standardized Bycatch Reporting Methodology ("SBRM") Omnibus Amendment. Plaintiffs contend that because NMFS declined to adopt the Council's recommendation, the level of observer coverage in the MSB will be so low as to violate the MSA. Plaintiffs' contention relies, in part, upon the fact that at that time, the SBRM inadequately allocated observers to the MSB fishery.

Our Court of Appeals has already found the SBRM to be unlawful and has remanded it to NMFS for further consideration. Oceana,

---

[10] For the first time in their Reply, Plaintiffs note that, having disapproved of the Council's observer coverage proposal, the Secretary failed to make specific recommendations for improvement as called for by 16 U.S.C. § 1854(a)(3)(C). The Court need not address this because an argument not raised in an opening brief is forfeited. Fox v. Gov't of D.C., No. 14-7042, 2015 WL 4385290, at *3 (D.C. Cir. July 17, 2015).

Inc. v. Locke, 670 F.3d 1238, 1243 (D.C. Cir. 2011). Accordingly, to the extent that Plaintiffs' contentions actually challenge the methodology of the SBRM, the Court shall decline to consider them, given the Court of Appeals' remand to NMFS. See Oceana, 831 F. Supp. 2d at 114 ("No matter the grounds for [plaintiff's] present challenge to the Multispecies FMP's standardized bycatch-reporting methodology, this Court can provide no further relief because the SBRM Amendment has already been remanded.").

However, it would appear that Plaintiffs are not without remedy with respect to the validity of the SBRM. As Judge Contreras stated in Oceana, "[t]o the extent Plaintiffs subsequently believe the standardized bycatch-reporting methodology that eventually results from [] remand is inadequate, [they] will have the opportunity to challenge it at a future date." Id.

### 3.    Observer Coverage and Production of Reliable Data

Not all of Plaintiffs' challenges to the level of observer coverage in the fishery are based upon NMFS's denial of the 100% coverage scheme or objections to the SBRM methodology which is no longer in effect. Plaintiffs also argue that the elements of Amendment 14 that the Government did adopt are -- without the 100% observer coverage -- insufficient to meet its obligations under the MSA.

Plaintiffs contend that the MSA's National Standard 2, which states that "[c]onservation and management measures shall be based

upon the best scientific information available," 16 U.S.C.
§ 1851(a)(2), requires NMFS to "deploy sufficient observer
coverage to provide statistically reliable data," Pls.' Reply at
4 (citing Oceana, Inc. v. Evans, No. 04-0811(ESH), 2005 WL 555416,
at *40 (D.D.C. 2005)); Oceana, 670 F. 3d at 1239.[11] While Plaintiffs
admit that "the MSA does not require specific observer coverage
levels," Pls.' Reply at 4, they argue that current observer levels
are insufficient to produce statistically reliable data.

Plaintiffs misconstrue National Standard 2.    National
Standard 2 requires NMFS to base "[c]onservation and management
measures . . . upon the best scientific information available[.]"
16 U.S.C. § 1851(a)(2) (emphasis added). "[NMFS must] utilize the
best scientific data available, not the best scientific data
possible." The Ocean Conservancy v. Gutierrez, 394 F. Supp. 2d
147, 157 (D.D.C. 2005) aff'd sub nom. Oceana, Inc. v. Gutierrez,
488 F.3d 1020 (D.C. Cir. 2007) (quoting Bldg. Indus. Ass'n of
Superior California v. Norton, 247 F.3d 1241, 1246 (D.C. Cir.
2001)).

---

[11] Neither of the two cases from this circuit that Plaintiffs cite
actually support their proposition that the MSA requires
sufficient observers to generate statically reliable data. The
sections of each case that Plaintiffs cite discuss the data-
collection goals of particular rules promulgated by NMFS rather
than requirements of the MSA. See Oceana v. Evans, 2005 WL 555416,
at *40; Oceana, 670 F. 3d at 1239.

Section 1851(a)(2) "'does not mandate any affirmative obligation on [NMFS'] part' to collect new data." <u>Massachusetts v. Pritzker</u>, 10 F. Supp. 3d 208, 220 (D. Mass. 2014) (quoting <u>Commonwealth of Mass. by Div. of Marine Fisheries v. Daley</u>, 10 F.Supp.2d 74, 77 (D. Mass. 1998)). Indeed, National Standard Guidelines acknowledge that NMFS might often have "insufficient data" in fisheries and provide guidance on how to proceed. <u>See</u>, <u>e.g.</u>, 50 C.F.R. §§ 600.310(e)(iv), (g)(2),(4) and (l)(1).[12]

Plaintiffs also contend that current observer coverage levels violate § 1853(a)(11)'s requirement that NMFS "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery[.]" At its core, this argument attacks the SBRM, which as noted above, is already on remand and thus, is beyond this Court's review. <u>Oceana</u>, 831 F. Supp. 2d at 114.

Plaintiffs argue that "it was arbitrary and capricious to reject the measures that the Council developed to provide the Secretary with reliable estimates of catch when it has a mandatory duty to provide them under 16 U.S.C. § 1853(a)(5)." Pls. Mot. at

---

[12] Plaintiffs rely on a slip opinion from the U.S. District Court for the District of Alaska. <u>See</u> <u>The Boat Company v. Pritzker</u>, No. 12-cv-0250-HRH slip op. at 33 (D. Alaska, Aug. 6, 2014). That case is inapposite because it construes a statute applicable only to North Pacific fisheries. <u>See</u> 16 U.S.C. § 1862 (b)(1)(A) (requiring the North Pacific Council to ensure plans and plan amendments are reasonably calculated to "gather reliable data").

29.   Section 1853(a)(5) merely requires that FMPs "specify the pertinent data which shall be submitted to the Secretary . . . including, but not limited to . . . catch by species in numbers of fish or weight thereof[.]" Id. On its face § 1853(a)(5) does not give rise to any duty to collect additional data through increased observer coverage.

Finally, Plaintiffs argue that without significantly increasing observer coverage, NMFS will be unable to "establish a mechanism for specifying annual catch limits in the plan . . . at a level such that overfishing does not occur in the fishery . . . including measures to ensure accountability" as required by 16 U.S.C. § 1853(a)(15).

However, regulations implementing the MSA already clearly contemplate the possibility that annual catch limits and accountability measures might have to be accepted on the basis of limited data. 50 C.F.R. § 600.310(g)(4) ("Some fisheries have highly variable annual catches and lack reliable inseason [sic] or annual data on which to base [accountability measures]. If there are insufficient data upon which to compare catch to [annual catch limits], either in season or on an annual basis, [accountability measures] could be based on comparisons of average catch to average [annual catch limits] over a three-year moving average."); see also id. § 600.310(g)(2).

In summary, the Government has reasonably concluded that the Council's observer coverage proposal would violate applicable law, and Plaintiffs have failed to show that NMFS is legally required to produce more abundant data by way of increased observer coverage. Accordingly, the Court concludes that the Government has not been arbitrary and capricious in rejecting Plaintiffs' challenge to Amendment 14's lack of additional observer coverage must fail.[13]

### C.    Count III: The National Environmental Policy Act

Plaintiffs contend that the Government failed to adequately consider the environmental impact of failing to add the river herring and shad stocks to the fishery.

It has long been established that NEPA requires agencies to "take a 'hard look' at the environmental consequences before taking a major action." Baltimore Gas & Elec. Co., 462 U.S. at 97 (1983) (internal citations omitted). To comply with this requirement, agencies contemplating major policy proposals, must prepare Environmental Impact Statements ("EIS") that "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14; see also 42 U.S.C. § 4332(C).

---

[13]    Again, the fact that SBRM is on remand limits the Court's ability to address this issues.

The EIS must be "evaluated in light of [its reasonably identified and defined] objectives; an alternative is properly excluded from consideration in an environmental impact statement only if it would be reasonable for the agency to conclude that the alternative does not 'bring about the ends of the federal action.'" City of Alexandria, Va. V. Slater, 198 F.3d 862, 867 (D.C. Cir. 1999).

Plaintiffs' principal objection to the Government's final EIS is that NMFS should have included at least one policy alternative, of the four it chose, that would have analyzed the effect of not immediately adding river herring and shad stocks to the MSB Fishery.  They argue that without analysis or explanation, NMFS rejected the possibility of giving a "hard look to see the consequences of including the stocks in the MSB as part of Amendment 14."  Pls.' Mot. at 43.

The Government argues that it had no legal obligation to consider the alternative of not immediately adding river herring and shad to the MSB Fishery.  The four alternatives which were chosen by NMFS simply cannot satisfy the Government's obligation to consider the impacts of refusing to add river herring and shad to the fishery, especially given the fact that the 2011 statutory deadline was not being met.

Amendment 14 fails to take a hard look at the environmental impacts of its composition of the fishery by failing to analyze a reasonable range of alternatives.  Those alternatives should have included the immediate addition of river herring and shad as stocks with temporary conservation and management measures as proxies for status determination criteria and other measures necessary to prevent overfishing and conservation of the species.

NEPA requires an agency to explore and objectively evaluate a reasonable range of alternatives and the associated impacts on the environment.  42 U.S.C. § 4332(C).  See also Flaherty, 850 F. Supp.2d at 71.  A key objective of Amendment 14 was to consider adding river herring and shad to the MSB Fishery, in order to prevent overfishing.  Given that objective, it is hard to understand why the Government, which is statutorily obligated to consider an adequate range of alternatives in the EIS, failed to include the alternative of adding river herring and shad to the stocks.

Moreover, it is striking that NMFS never provided an explanation of why it did not consider the alternative of adding river herring and shad when such consideration would clearly have brought about the "ends of the federal action."

In Flaherty, this Court emphasized that "[a] central function of NEPA's requirements is for the agency to consider environmental

- 36 -

impacts '[b]efore approving a project,'" not after the damage is done. 850 F.2d at 72 (emphasis added). Instead of even considering the environmental impact of not including river herring and shad in the MSB Fishery, Defendants pushed the issue off to Amendment 15, thereby delaying even further consideration of a reasonable alternative which had long been sought by many members of the public. "Agency determinations about EIS requirements are supposed to be 'forward-looking,'" not action to simply postpone consideration of relevant alternatives. Foundation on Economic Trends v. Heckler, 756 F.2d 143, 158 (D.C. Cir. 1985).

Consequently, the Court concludes that Final Rule 14 violates NEPA and the APA by failing to take a "hard look" at the environmental impacts of its definition of the fishery, by failing to analyze the reasonable alternative of examining the environmental impact of not adding the river herring and shad to the fishery, and by failing to consider the direct, indirect, and cumulative impacts of its decision in the accompanying EIS.

## CONCLUSION

In summary, the Court has concluded that as to Count 1 – the failure to include river herring and shad stocks in the MSB fishery, and as to Count 2 – monitoring and accountability measures to prevent overfishing -- the Government has not violated either the MSA or the APA for the reasons spelled out in Sections A and

B, supra.    However, as to Count 3 – the National Environmental Policy Act –= the Court concludes that the Government has failed to comply with NEPA and the APA because it has not taken a "hard look" at all of the ramifications from failing to consider the impact of not immediately including river herring and shad in the MSB fishery.

A separate Order accompanies this Memorandum Opinion.

Gladys Kessler

Gladys Kessler
United States District Judge

**Copies via ECF to all counsel of record**