## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGLERS CONSERVATION NETWORK *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>WILBUR L. ROSS, JR., *et al.*,<br><br>    *Defendants*. | Civil Action No. 14-509 (TJK) |

### MEMORANDUM OPINION AND ORDER

Several organizations and individuals brought this action challenging an amendment adopted by the National Marine Fisheries Service to a fishery management plan that regulates several species of fish in the mid-Atlantic region. The gravamen of their complaint was that the amendment should have added certain species—species that they assert require federal management under the applicable laws—to the plan, and that the decision to nevertheless adopt the amendment without those species was unlawful. The Court granted summary judgment for Plaintiffs on one of their claims and for Defendants as to the other two, and it then entered a remedial order requiring Defendants to undertake specific actions. Defendants represent that they have now complied with the directives in that remedial order. Plaintiffs disagree. They moved to enforce the order, and afterward the case was reassigned to the undersigned. For the reasons explained below, Plaintiffs' motion is **DENIED**.

I.   **Background**

   A.   **Summary Judgment Proceedings**

Plaintiffs Anglers Conservation Network, Captain Paul Eidman, Gateway Striper Club, Inc., and Philip Lofgren sued Wilbur L. Ross, Jr.,[1] in his official capacity as Secretary of Commerce, the National Oceanic and Atmospheric Administration, and the National Marine Fisheries Service ("Service"), challenging a final rule promulgated by Defendants—"Amendment 14"—that amends the fishery management plan for the mackerel, squid, and butterfish ("MSB") fishery off the eastern coast of the United States.  They brought claims under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 *et seq.*, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*

A thorough factual background of the case is set forth in the Court's Memorandum Opinion granting in part and denying in part the parties' cross-motions for summary judgment, and thus the Court only briefly recounts that background here.  *See Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102 (D.D.C. 2015).  The parties' central dispute concerns Defendants' regulatory decisions about four species of river herring and shad.  Plaintiffs insist that the species require "conservation and management" as that term is defined in the MSA.  Despite consideration of the issue during the development process, however, Amendment 14 did not include those species as regulated "stocks"[2] under the MSB fishery management plan.

---

[1] Under Federal Rule of Civil Procedure 25(d), Wilbur L. Ross, Jr., who assumed office on February 28, 2017, is automatically substituted for Penny Pritzker.

[2] The term "stock of fish" is defined as "a species, subspecies, geographical grouping, or other category of fish capable of management as a unit."  16 U.S.C. § 1802(42).  A federally managed fishery consists of those stocks that "can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical,

2

Plaintiffs brought three separate claims in their complaint, each alleging that promulgation of Amendment 14 violated applicable law. Count I alleged that Defendants were required under the MSA to include the four species of river herring and shad as regulated stocks in the MSB fishery management plan. *See* Compl. ¶¶ 113–29. Count II alleged that Amendment 14 lacked sufficient accountability measures to ensure that annual catch limits for the fishery are not exceeded, as required by the MSA. *Id.* ¶¶ 130–45. And Count III alleged that Defendants failed to take a "hard look" at Amendment 14's definition of the MSB fishery in violation of NEPA. *Id.* ¶¶ 146–54. The parties cross-moved for summary judgment on all three claims.

The Court granted in part and denied in part the parties' cross-motions. *See* ECF No. 46. On Plaintiffs' first count, the Court held that, in light of the administrative record, Defendants' determination that the four species of river herring and shad did not require "conservation and management"—and therefore that they did not need to include those species as stocks in the MSB fishery—was not arbitrary and capricious under the MSA or the APA. *Anglers*, 139 F. Supp. 3d at 115. As for Plaintiffs' second count, the Court likewise concluded that Defendants' decision not to include certain accountability measures in Amendment 14 did not violate the MSA or the APA. *Id.* at 118. Accordingly, the Court "dismissed" both those claims. *See* ECF No. 46 at 2.

On Count III, however, the Court found that Defendants had violated NEPA's procedural requirements. Specifically, the Court explained that the environmental impact statement (EIS) prepared as part of Amendment 14 did not consider, as one of the alternatives examined, a proposed action that would *immediately* add river herring and shad as stocks "with temporary

---

recreational, and economic characteristics." *Id.* § 1802(13)(A). Thus, by designating the river herring and shad species as stocks in the fishery, those species would be subject to the direct federal management that Plaintiffs seek.

conservation and management measures." *Anglers*, 139 F. Supp. 3d at 119. In neglecting to do so, the Court concluded, Defendants failed to "explore and objectively evaluate a reasonable range of alternatives and the associated impacts on the environment," as required by NEPA when an agency undertakes a major policy proposal such as an amendment to a fishery management plan. *Id.* (citing 42 U.S.C. § 4332(C)).

### B.      Remedial Proceedings

Recognizing the complexity of the case and the underlying regulatory scheme, the Court instructed the parties to file briefs laying out their proposals for an appropriate remedy. *See* ECF No. 46 at 3. On January 19, 2016, upon consideration of the parties' submissions, the Court entered a remedial order in which it denied Plaintiffs' request to vacate Amendment 14 in favor of ordering Defendants to "ensure" that the Mid-Atlantic Fishery Management Council (the "Council"), which develops amendments to the MSB fishery management plan, take a series of specific actions. *See* ECF No. 53 ("Rem. Order"). And it instructed Defendants to file status reports every 45 days apprising the Court of their progress in complying with those directives. *Id.* at 4. Because the parties' central dispute concerns the meaning of those directives, the Court will recount them fully here.[3]

Directive One and Directive Two simply remand the case to the Service and deny Plaintiffs' request to vacate Amendment 14. *See id.* at 2. And the penultimate directive, Directive 10, instructs Defendants to file status reports every 45 days, with which Defendants' compliance is not in dispute. *Id.* at 4. Those directives are thus not at issue here.

---

[3] The Court refers to each paragraph in the remedial order that begins with the language "ORDERED" as a separate "Directive," numbered sequentially such that the first of those paragraphs is referred to as "Directive 1."

Directive 3 orders that Defendants "shall ensure that the Council addresses the issue of adding River Herring and Shad as stocks in the fishery and makes a final decision on that issue no later than December 31, 2016." *Id.* at 2 (emphasis removed).

Directive 4 orders that Defendants "shall ensure that the Council reexamines a 2013 'White Paper' prepared by the Council's River Herring and Shad Committee, addressing conservation of River Herring and Shad before April 21, 2016." *Id.* at 3 (emphasis removed).

Directive 5 orders that Defendants "shall ensure that the Council prepares and updates the White Paper cited above[] to include an environmental analysis of the action that Plaintiffs prefer, namely, immediately adding River Herring and Shad to the fishery and managing it by use of proxies before April 30, 2016." *Id.* (emphasis removed).

Directive 6 orders that Defendants "shall ensure that the Council prepares a draft decision document on the issue of stocks in the fishery, including an analysis of the regulatory course Plaintiffs advocate, and that draft decision document shall be completed and presented to the Council's River Herring and Shad Committee for discussion[] and suggested changes no later than August 1, 2016." *Id.* (emphasis removed).

Directive 7 orders that Defendants "shall ensure that the Council, at its October 2016 meeting of the full Council, reviews the revised draft of the previously mentioned draft decision document, and at that meeting takes a final vote on whether to undertake preparation of a proposed Amendment and EIS to consider adding River Herring and Shad as stocks in the fishery," and further that "the public shall be invited and allowed to participate in these processes." *Id.* (emphasis removed).

Directive 8 orders that "in developing the EIS and the final draft of the . . . Committee['s] [decision document], [Defendants] shall ensure that there is full consideration, as Plaintiffs have

urged, of the earlier decision by the full Council to not add to Amendment 14 River Herring and Shad." *Id.* at 3–4 (emphasis removed).

Directive 9 orders that Defendants "shall ensure that there be full consideration of the impact of failing to include River Herring and Shad in the fishery, and that there be full consideration of the direct, indirect, and cumulative impacts of those decisions." *Id.* at 4 (emphasis removed).[4]

After the Court issued the order, Defendants moved for reconsideration, seeking either modification or clarification of several aspects of the Court's directives. *See* ECF No. 54. First, Defendants explained that because the Council is an independent body, Defendants have no authority to direct the Council to do anything. *Id.* at 4–7. They further noted that the Council was not a defendant to this suit and, in their view, was not subject to the APA. *Id.* at 5–6. For those reasons, Defendants argued that they could not "ensure," as the Court ordered, that the Council undertake specific action. *Id.* at 6. They requested that the Court modify the order to direct them to "recommend action by the Council in furtherance" of the enumerated directives. *Id.* Second, Defendants asked the Court to clarify what "final decision" it envisioned the Council reaching by December 31, 2016, as described in Directive 3, given that the Court instructed the Council to take a "final vote" on whether to begin preparing a proposed amendment to consider adding the four river herring and shad species as stocks in the fishery at its October 2016 meeting in Directive 7. *Id.* at 8. If the Council voted in October to begin

---

[4] Directive 11 states that the Court "expects the Remedial Action to be completed within a period of 18 months from February 1, 2016." Rem. Order at 4 (emphasis removed). Defendants completed the actions they insist satisfied the Court's orders well within that timeframe, and thus whether they satisfied this requirement turns entirely on the parties' disputes as to the other directives.

6

preparation of such an amendment, Defendants explained, it would do so and, upon completion, submit it to the Service for review.  If, on the other hand, the Council voted not to undertake such an amendment, then that would be the final decision from the Council on the matter.  In either event, Defendants asserted, the December deadline was superfluous.  *Id.*[5]

The Court granted Defendants' motion in part.  *See* ECF No. 58.  It denied Defendants' first request, explaining that, while Defendants "have [no] authority to order any of the Councils to take a specific action," "once a Council reaches a final decision, it is then [Defendants] which ha[ve] the ultimate statutory responsibility for ensuring that the requirements of the [MSA] and any other applicable laws are met."  *Id.* ¶ 1.  As to Defendants' second request, however, the Court agreed that "if the Council votes to not undertake preparation of the Amendment and EIS, then Defendants are correct that there would be no need for a December 31 decision point," rendering Directive 3 "superfluous."  *Id.* ¶ 4.  Accordingly, the Court vacated Directive 3.  *Id.*

Over the course of the ensuing months, Defendants filed periodic status reports updating the Court on the actions taken by them and the Council in accordance with the Court's instructions.  In May 2016, Defendants represented that the Committee had reexamined the White Paper and devised a plan to update it and prepare a corresponding draft decision document for review at their meeting in August.  *See* ECF No. 59.  At that meeting, which was open to the public, the Committee decided to make additional changes and prepare finalized versions for the full Council's review at its October 2016 meeting.  *See* ECF No. 64; ECF No. 65.  On October 4,

---

[5] Defendants also made several requests for minor modifications to specific directives that would more realistically align those orders with the capabilities and procedures of Defendants and the Council.  Those requests do not bear on the parties' dispute here and thus the Court need not recount them.

7

2016, the Committee met once more, reviewed the updated White Paper and draft decision document, and voted to submit the following recommendation to the full Council:

> [T]hat the Council not act to add RH/S as stocks in the MSB FMP and that it shall be the policy of the [Council] to aggressively protect river herring and shad stocks by proactively using the tools provided in the recently approved [Ecosystem Approach to Fisheries Management] Guidance Document and continuing to use the catch caps to provide strong incentives to harvesters such that they will change the "when where and how" they fish so as to reduce river herring and shad bycatch.

ECF No. 67 at 2. The next day, the Council voted 13-6 to adopt that recommendation and to decline to undertake an amendment that would add the river herring and shad species as stocks in the fishery. *Id.* at 4. Accordingly, Defendants represented, they had at that point complied with all the requirements of the Court's remedial order. *Id.* Several weeks later, Plaintiffs filed the instant motion to enforce. And about a year after Plaintiffs filed their motion, the case was reassigned to the undersigned.

## II.     Legal Standard

"District courts have the authority to enforce the terms of their mandates." *Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 55 (D.D.C. 2014). That authority is grounded in "the interest of the judicial branch in seeing that an unambiguous mandate is not blatantly disregarded by parties to a court proceeding." *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984). Part and parcel with that authority "is the power to construe and interpret the language of the judgment." *Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 11–12 (D.D.C. 2004), *aff'd on other grounds sub nom.*, *Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24 (D.C. Cir. 2005). The Court "is generally the authoritative interpreter of its own remand." *AT&T Wireless Servs., Inc. v. FCC*, 365 F.3d 1095, 1099 (D.C. Cir. 2004). And a motion to enforce is "the usual method for requesting a court to interpret its own judgment" and to compel compliance if necessary in light of that interpretation. *Heartland Hosp.*, 328 F. Supp. 2d at 11.

8

A court "should grant a motion to enforce if a 'prevailing plaintiff demonstrates that a defendant has not complied with a judgment entered against it.'" *Sierra Club v. McCarthy*, 61 F. Supp. 3d 35, 39 (D.D.C. 2014) (quoting *Heartland Hosp.*, 328 F. Supp. 2d at 11). In determining whether an agency has complied with the terms of a remedial order on remand, the Court is guided not only by the text of that order but also by its relevant opinions. *See City of Cleveland v. Fed. Power Comm'n*, 561 F.2d 344, 346–47 (D.C. Cir. 1977). That said, "[s]uccess on a motion to enforce a judgment gets a plaintiff only 'the relief to which [the plaintiff] is entitled under [its] original action and the judgment entered therein.'" *Heartland Reg'l Med. Ctr.*, 415 F.3d at 29 (second and third alterations in original) (quoting *Watkins v. Washington*, 511 F.2d 404, 406 (D.C. Cir. 1975)).

### III.  Analysis

Plaintiffs' claims that Defendants have not complied with the Court's remedial order can be grouped into two general challenges. First, Plaintiffs contend that Defendants failed to ensure that the environmental analysis conducted by the Council conformed to the specific directives of the Court in its remedial order. *See* ECF No. 69-1 ("MTE Br.") at 10. That analysis, they argue, was inadequate given the Court's directives and, in any event, was substantively flawed. *See id.* at 10–13. Second, Plaintiffs argue that Defendants, in responding to the remedial order, "failed to ensure that requirements of the Magnuson Stevens Act and other applicable laws were met," and that the Court should "enforce" the remedial order accordingly. *See id.* at 21–31. The Court addresses each category of claims in turn.

#### A.  Compliance with the Remedial Order's Directives

Plaintiffs raise a wide array of challenges to the environmental analysis conducted in response to the remedial order. They range from charges that the Council neglected certain factors in analyzing the environmental impacts of regulating river herring and shad as stocks in

9

the fishery, *see id.* at 13, to claims that the Council's conclusions about the effect of its decision to adopt Amendment 14 were faulty, *see id.* at 16–18, to challenges to the Council's analysis of the future impacts of not adding river herring and shad to MSB fishery, *see id.* at 18–19.  Only briefly, however, do Plaintiffs link these objections to the Court's specific instructions in the remedial order.  *See id.* at 13 (citing Directive 5); *id.* at 18 (citing Directive 8); *id.* at 19 (citing Directive 9).  Defendants, contending that Plaintiffs are seeking relief far beyond the scope of a motion to enforce that order, respond that they have fully complied with its "plain text."  *See* ECF No. 74 at 6.  The Court agrees.

      At the outset, the Court notes that its task in ruling on Plaintiffs' motion is limited.  Plaintiffs specifically seek to enforce the Court's remedial order, as amended.  *See* ECF No. 69 at 1.  And thus to show that they are entitled to that relief, Plaintiffs must show that Defendants have not complied *with that order*—not with whatever remedies the Court could have adopted but elected not to order.  *See Sierra Club*, 61 F. Supp. 3d at 39–41.  The Court therefore notes what its remedial order *did not* do.  *See AT&T Wireless*, 365 F.3d at 1099 ("The court is generally the authoritative interpreter of its own remand.").  Before issuing the remedial order, the Court recognized that the regulatory circumstances were considerably "muddled" and asked the parties to "[p]resent[] their views as to what action taken by the court would be appropriate and *realistic* at this stage of the proceeding."  Rem. Order at 1–2 (second alteration in original) (quoting ECF No. 46 at 3).  After consideration of their respective positions, the Court expressly rejected the typical course of vacating the amendment and leaving it to the agency whether to repromulgate it, subject to applicable laws.  *See id.* at 2 & n.1.  Rather, it set forth a series of specific "*actions* which must be taken in a reasonable time," in what the Court described as an "attempt[] to ensure that this time around, Defendants complied with NEPA."  *Id.* at 2 (emphasis

added).  Those discrete actions, which constitute the directives enumerated above, are therefore the touchstones of Defendants' compliance with the remedial order.  Whatever the wisdom of that remedial course may be in hindsight, Plaintiffs have not sought reconsideration of the Court's earlier conclusions as to a suitable remedy, and thus those conclusions are simply not before the Court in ruling on their motion to enforce.

Turning to the text of the order, Plaintiffs ground their first set of arguments in support of their motion in Directives 5 and 6.  *See* MTE Br. at 8, 13.  As noted, Directive 5 instructs Defendants to "ensure that the Council prepares and updates the White Paper . . . to include an environmental analysis of the action that Plaintiffs prefer, namely, immediately adding River Herring and Shad to the fishery and managing it by use of proxies."  Rem. Order at 3.  And Directive 6 similarly instructs Defendants to "ensure that the Council prepares a draft decision document on the issue of stocks in the fishery, including an analysis of the regulatory course Plaintiffs advocate," to be presented to the full Council prior to a vote on whether to proceed with a new amendment.  *Id.*

The updated White Paper and draft decision document satisfy those directives.  The 2016 White Paper, as revised by the Committee following a public meeting, includes a section specifically examining the environmental impacts of immediately adding river herring and shad to the fishery and managing it by use of proxies.  *See* ECF No. 69-2 at 64–72.  The paper first outlines the various commercial, environmental, and social benefits that would accrue from restoring river herring and shad species to their historical levels, *see id.* at 64–66, recognizing that the ultimate restoration objective would "likely constitute substantial value to the Nation," *id.* at 66.  But the paper reasons that because of ongoing management of the species by parallel state bodies, the indirect catch caps put in place by Amendment 14 through the mackerel and

11

Atlantic herring fisheries, and other collaborative efforts to "engage in [river herring and shad] conservation" outside direct management—*i.e.*, the "status quo"—the environmental impacts of immediately adding river herring and shad to the fishery would be "minimal." *See id.* at 68–69, 71–72. Indeed, the paper explains that the only significant regulatory difference between the status quo and the course Plaintiffs prefer would be the immediate implementation of "status determination criteria" and "acceptable biological catches," as well as the potential designation of an essential fish habitat. *See id.* at 71–72. The paper concludes, however, that those additional measures would be unlikely to lead to a different outcome. *See id.* And it provides several bases for this conclusion, including that it was unclear whether recent catches were having "substantial impacts" on river herring and shad populations because those catches were only a "small fraction of historical catches," that the species were being actively managed by state agencies, the uncertainties of using a proxy, the existing catch caps, and the limited agency resources available. *See id.* The draft decision document presented to the Council largely repeated this analysis. *See* ECF No. 69-3 at 15–23.

Though not disputing that the updated White Paper and draft decision document included an analysis of "immediately adding River Herring and shad to the fishery and managing it by use of proxies," Plaintiffs argue that Defendants still failed to comply with those directives because the analysis "d[id] not constitute a hard look at the problem." MTE Br. at 13–14. A hard look, they say, would involve various factors that they contend the Council should have included in that analysis. *Id.* Yet they provide no bases grounded in the remedial order itself for their demands. *See id.* at 13–15. Plaintiffs appear to assume that the Court ordered Defendants to conduct a full-scale reanalysis of its prior decision to adopt Amendment 14. *See id.* at 12–13 (arguing that the analysis "does not meet the terms of the Court's Orders *and* cure [Defendants']

12

NEPA violations because it failed to . . . analyz[e] a reasonable range of alternatives (*some of which were court ordered*)" (emphasis added)); ECF No. 78 ("Reply") at 8 (arguing that the analysis "is [in]consistent with the NEPA analysis ordered by this Court"). But the Court did no such thing. Rather, the Court laid out a set of steps that, in its view, constituted an appropriate *remedy* for the NEPA violation it identified—namely, the decision not to include immediately adding river herring and shad as an alternative in the EIS. *See Anglers*, 139 F. Supp. 3d at 119. Plaintiffs have not shown that Defendants have failed to comply with the two steps outlined in Directives 5 and 6 to ensure that an analysis of that alternative was included in the updated White Paper and draft decision document.

Plaintiffs link the remainder of their objections to the Council's environmental analysis to Directives 8 and 9. *See* MTE Br. at 16–20. As noted, Directive 8 ordered that, "in developing the EIS and the final draft of the Council's River Herring and Shad Committee['s] [decision document]," Defendants must "ensure that there is full consideration, as Plaintiffs have urged, of the earlier decision by the full Council to not add to Amendment 14 River Herring and Shad." Rem. Order at 3–4. And Directive 9 further provides that Defendants must "ensure that there be full consideration of the impact of failing to include [those species] in the fishery, and that there be full consideration of the direct, indirect, and cumulative impacts of those decisions." *Id.* at 4. Plaintiffs argue that the analysis included in the Council's final decision document, ECF No 69-4, is faulty, they dispute some of the Council's assumptions and reasoning, and they contend that the Council failed to undertake a thorough analysis of "cumulative impacts." *See* MTE Br. at 16–20; Reply at 13–14.

Once again, however, Plaintiffs misunderstand the framework of the remedial order. As contemplated by Directive 7, at its October 2016 meeting, the full Council reviewed the updated

13

White Paper and final decision document and voted on whether to undertake preparation of a proposed amendment and an accompanying environmental impact statement. *See* ECF No. 67. The Council voted not to proceed. *See id.* at 4. Accordingly, Directives 8 and 9, which address the "full consideration" that the Council must give to the decision not to add river herring and shad to Amendment 14, or a future amendment *if* the Council determined to undertake a new amendment and new environmental impact statement, are inapplicable. Rem. Order at 3–4.

In insisting otherwise, Plaintiffs again presume that the Court ordered Defendants to undertake a complete NEPA analysis *as if* Defendants were promulgating an amendment concerning whether to include river herring and shad as stocks in the fishery management plan. *See* Reply at 13–14 (relying on case law outlining agencies' obligations under NEPA to demonstrate that Defendants failed to comply with the remedial order). But the Court, in rejecting vacatur in favor of the more incremental response outlined in the remedial order, specifically declined to require as much. Indeed, this approach was precisely what Defendants proposed in their remedy brief. *See* ECF No. 50. They represented that the Council had at that time already planned to conduct renewed environmental analyses that could address the regulatory action Plaintiffs preferred and that, given that "NEPA analysis can be expensive and time-consuming," the Council's proposal offered "a more streamlined environmental analysis" "*without* [the] need to comply with the entire suite of NEPA procedural requirements." *Id.* at 8–9 (emphasis added). And they further represented that *if* "the Council vote[d] . . . to undertake an amendment to consider adding river herring and shad to the fishery," *then* Defendants would work with the Council to ensure that a complete NEPA analysis was undertaken. *Id.* at 9. The Court endorsed that approach when it largely mirrored those proposed steps in the remedial order.

14

### B.      Compliance with the MSA and "Other Applicable Laws"

Besides challenging Defendants' compliance with the specific directives of the remedial order, Plaintiffs also argue that the Court should "enforce its order because Defendants failed to ensure that requirements of the [MSA] and other applicable laws were met."  MTE Br. at 21.  Plaintiffs claim that the record shows that river herring and shad require conservation and management, and that the Council's decision in October 2016 not to proceed with a new amendment including those species as stocks in the fishery was based on erroneous analysis and incorrect factors under the MSA.  *See id.* at 23, 26.

These arguments are wholly untethered to the dictates of the remedial order.  The Court only granted summary judgment for Plaintiffs on their NEPA claim.  *See Anglers*, 139 F. Supp. 3d at 119–20.  It did not grant summary judgment for Plaintiffs on either of their claims that Defendants violated the MSA.  *Id.*  In fact, it dismissed those claims.  *See* ECF No. 46.  For this reason alone, Plaintiffs have no basis to seek, by a motion to enforce a remedial order related to their NEPA claim, to have the Court determine that Defendants have now violated the MSA and order relief accordingly.[6]  Plaintiffs nevertheless point to the Court's statement in its order amending the remedial order that the Service "has the ultimate statutory responsibility for ensuring that the requirements of the [MSA] and any other applicable laws are met."  ECF No. 58 at 1.  But Plaintiffs' reliance on that language is misplaced.  The Court was merely justifying its basis for ordering that Defendants "ensure" that certain analyses were completed by the

---

[6] Plaintiffs also overlook the fundamental problem that the actions which they seek to challenge pursuant to the MSA and the APA are likely not subject to judicial review.  Not only are those decisions not final, *see Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 669–70 (D.C. Cir. 2016), but the Council is not an agency as defined under the APA and therefore not subject to the Court's jurisdiction, *see Flaherty v. Ross*, Civil Action No. 11-660 (TJK), 2019 WL 1102712 (D.D.C. Mar. 9, 2019).  Plaintiffs cannot use their motion to enforce a remedial order on their NEPA claim to circumvent those strict barriers.

Council.  It was not, as Plaintiffs maintain, expanding the scope of the remedial order to subject any action by the Council to immediate scrutiny under the MSA and APA.  Such claims are the proper subject of a new complaint.

## IV.     Conclusion & Order

For the foregoing reasons, it is hereby **ORDERED** that Plaintiffs' Motion to Enforce, ECF No. 69, is **DENIED**.

It is further **ORDERED** that the parties shall meet, confer, and submit a joint status report no later than June 28, 2019, discussing how the parties would like to proceed in this matter.  That report shall specifically address:

1) Whether Plaintiffs still seek to file a supplemental complaint and, if so, a proposed briefing schedule for Plaintiffs' Motion for Leave to File a Supplement Complaint, ECF No. 71;

2) Whether this case is related to Civil Case No. 16-2217, currently assigned to Judge Friedrich, pursuant to LCvR 40.5, and, if so, whether that case should be reassigned to the undersigned and proceedings in that case consolidated with this case.

To the extent that the parties disagree on any matter addressed in the status report, the parties shall set forth their respective positions.

It is further **ORDERED** that proceedings on Plaintiffs' Motion for Leave to File a Supplemental Complaint, ECF No. 71, shall remain stayed until further order of the Court.

**SO ORDERED.**

/s/ Timothy J. Kelly  
TIMOTHY J. KELLY  
United States District Judge

Date: May 28, 2019